# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

2016-SC-000368-WC

ARMSTRONG COAL COMPANY, INC.                         APPELLANT

                 ON APPEAL FROM COURT OF APPEALS
                 CASE NO. 2015-CA-001545-WC
V.                   WORKERS' COMPENSATION BOARD
                 NO. 14-WC-90179

NATHAN ATTEBURY;                            APPELLEES
HON. CHRIS DAVIS,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

An Administrative Law Judge (ALJ) found that Nathan Attebury

developed toxic encephalopathy and is permanently totally disabled as a result

of exposure to toluene, a chemical in Krylon paint, while working for Armstrong

Coal Company, Inc. The Workers' Compensation Board (the Board) affirmed,

as did a divided panel of the Court of Appeals. On appeal to this Court,

Armstrong argues, as it did below, that the ALJ's findings were not supported

by evidence of substance. For the following reasons, we disagree and affirm.

## I. BACKGROUND.

Attebury was born on June 8, 1981. He has a high school education and

his mine-foreman certification, and he has worked as a construction laborer, in

a clothing factory, and as an underground coalminer. Approximately six

months after he started working for Armstrong, Attebury began to experience headaches, dizziness, short-term memory loss, and confusion. His symptoms progressively worsened, and he stopped working in January 2014. Attebury testified that he had previously suffered from seasonal affective disorder, for which he took an anti-depressant, and from panic attacks, anxiety, and headaches. Attebury also testified that he had been prescribed Suboxone in order to wean himself from Lortab that he took following a neck injury.

Attebury first sought treatment for his symptoms with Dr. Jayna Jones in January 2014. Dr. Jones noted that Attebury complained of dizziness, headaches, memory loss, social anxiety, occasional "blackout spells," and confusion. Attebury attributed his symptoms to the paint he was using at work and stated that his symptoms improved when he was off work for any length of time. Dr. Jones referred Attebury to Dr. Michael Mayron, a neurologist.

Dr. Mayron, who first treated Attebury on February 17, 2014, noted that Attebury had neuropathy in his left arm and leg, tremors in both hands, and severe memory impairment. Following his examination and a review of medical literature, Dr. Mayron made a diagnosis of toxic encephalopathy, which he attributed to Attebury's exposure to the chemical toluene, a component of the Krylon spray paint Attebury used at work. Based on Attebury's memory loss and inability to perform multi-step tasks, Dr. Mayron assigned him a 49% impairment rating. In his report and during his deposition, Dr. Mayron

2

referred to an article from the *Annals of Neurology* from June 1988 to support his conclusions that Attebury's condition was related to exposure to toluene. During his deposition, Dr. Mayron stated that he had reviewed other articles, which he did not have readily available. However, he supplied copies of those articles to the court reporter after his deposition. We discuss the articles Dr. Mayron relied on in more detail below.

Armstrong filed the report of Dr. Dennis O'Keefe, a neurologist who performed an independent medical evaluation of Attebury at Armstrong's request. In his report, Dr. O'Keefe stated that Attebury complained of depression, anxiety, headaches, and memory loss that became severe in December 2013. Dr. O'Keefe's examination revealed deficits in immediate recall, attention, and calculation; an "essentially normal" ability to speak and answer questions; and lightheadedness after two minutes of hyperventilation. Dr. O'Keefe stated that two chemicals in Krylon paint could cause neurological problems: xylene, which causes dizziness, lightheadedness, and other symptoms; and N-hexane, which causes neuropathy in the extremities. He noted that Attebury had no symptoms of extremity neuropathy and that symptoms associated with xylene exposure generally resolve once exposure to the chemical stops. Based on the preceding, Dr. O'Keefe concluded that Attebury's symptoms were not related to exposure to chemicals in Krylon but to Attebury's depression, which Dr. O'Keefe attributed to "claustrophobia associated with" working in an underground coalmine.

Before the ALJ, Armstrong argued that Dr. Mayron's opinion regarding causation was not probative because he: had no history of Attebury's prior complaints of headaches; relied on literature that pertained "to a different type of toluene exposure testing in a different type of injury;" and did not know how much Krylon Attebury used, how he used it, how often he used it, or whether Attebury had any other exposure to toluene. Armstrong also argued that the amount of toluene Attebury was exposed to was below OSHA's permissible limits.

The ALJ disagreed with Armstrong and found as follows:

On the issue of causation both Dr. Mayron and Dr. O'Keefe have provided an opinion. Both have independently researched the effects of the Krylon paint used by the Plaintiff. Both have concluded that the paint can cause neurological effects. From that point their opinions diverge.

Dr. O'Keefe believes the paint can cause two different types of neurological condition[s]. The first, primarily effecting the limbs, the Plaintiff does not have. The second, according to Dr. O'Keefe, is not permanent and its effects should resolve entirely when exposure to the paint stops. Dr. O'Keefe affirmatively states the Plaintiff does not have toxic encephalopathy, regardless of causation. Dr. O'Keefe affirmatively states the Plaintiff has no work-related condition.

Dr. Mayron states that one of the potential side effects of the Krylon paint is toxic encephalopathy. This is the diagnosis he makes for the Plaintiff. He states the toxic encephalopathy is work-related. Dr. Mayron testified in his deposition that he extensively reviewed the Krylon paint, particularly the toluene. It can cause the toxic encephalopathy and it can cause all of the Plaintiff's neurologic symptoms. The damage is permanent. In short, while I respect both physicians who provided an opinion regarding causation I am more inclined to find the opinion of Dr. Mayron persuasive. He is a treating physician with no known or demonstrated bias. His is a very specific field and area of expertise to which he devotes his practice, i.e. neurological conditions. He has demonstrated the scholarly texts he relies upon. There is no

4

other known source of causation for the Plaintiff's symptoms, as I agree that the ADHD, anxiety or depression is not causing them.

I am not persuaded by the Defendant's argument that Dr. Mayron had insufficient knowledge regarding the amount of toluene exposure. The Plaintiff testified to me and related to Dr. Mayron his exposure levels. That it was not measured in parts per milliliter or some other scientifically exact amount is not decisive. I find, based on the foregoing, that the Plaintiff does have toxic encephalopathy and it is work-related.

Armstrong appealed to the Board specifically arguing for the first time that Dr. Mayron's opinion did not meet the requirements of *Daubert* and was therefore unreliable. The Board affirmed, as did a divided panel of the Court of Appeals.

## II. STANDARD OF REVIEW.

If the party with the burden of proof is successful before the ALJ, the question on appeal is whether the ALJ's opinion was supported by substantial evidence. *Wolf Creek Collieries v. Crum*, 673 S.W.2d 735, 736 (Ky. App. 1984); *Whittaker v. Rowland*, 998 S.W.2d 479, 481 (Ky. 1999). This Court will only reverse the ALJ when he or she has overlooked or misconstrued controlling law or so flagrantly erred in evaluating the evidence that it has caused gross injustice. *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992). In other words, the determinative question to be answered is whether the ALJ's finding "is so unreasonable under the evidence that it must be viewed as erroneous as a matter of law." Kentucky Revised Statute (KRS) 342.285; *Ira A. Watson Dept. Store v. Hamilton*, 34 S.W.3d 48, 52 (Ky. 2000).

## III. ANALYSIS.

Armstrong argues on appeal to this Court that the ALJ could not rely on the opinion of Dr. Mayron because that opinion failed to meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) as adopted and applied in *City of Owensboro v. Adams*, 136 S.W.3d 446 (Ky. 2004). According to Armstrong, "the ALJ, the Board, and the Court of Appeals each performed a *Daubert* analysis, but each analysis focused on Dr. Mayron's credentials rather than on his methodologies," and his methodologies are fatally flawed. We disagree.

We begin by noting that *Daubert* applies to workers' compensation proceedings. *Id.* at 450. An ALJ, like a trial judge conducting a bench trial, functions as both gatekeeper, admitting and excluding evidence as appropriate, and as fact finder. *Id.* When applied in a jury trial, the *Daubert* analysis acts as a guide for the judge to make decisions on whether to exclude from the jury's consideration evidence that is scientifically unreliable. *Id.* However, when acting as both gatekeeper and fact finder, the ALJ, like the trial judge in a bench trial, has greater discretion and may admit evidence that would be excluded from a jury trial but then disregard that evidence when making a final determination. *Id.* at 451. That discretion is not limitless and an ALJ, like a trial judge, cannot completely abdicate his/her responsibility to make a reliability determination. *Id.*

The list of factors an ALJ may consider when judging the reliability of an expert opinion includes:

(1) whether the theory or technique can be and has been tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and

(4) whether the theory or technique has been generally accepted in the particular field.

*Toyota Motor Corp. v. Gregory,* 136 S.W.3d 35, 39–40 (Ky. 2004), *as amended* (June 14, 2004). However, the preceding list is neither exhaustive nor rigid. "[A] court may consider one or more or all of the factors mentioned in *Daubert,* or even other relevant factors, in determining the admissibility of expert testimony. The test of reliability is flexible and the *Daubert* factors neither necessarily nor exclusively apply to all experts in every case." *Johnson v. Commonwealth,* 12 S.W.3d 258, 264 (Ky. 2000).

It appears that Armstrong's attack on Dr. Mayron's opinion is four-fold. First, Armstrong argues that the primary learned treatise Dr. Mayron relied on relates toxic encephalopathy to exposure to toluene and that treatise is irrelevant because it does not address occupational exposure. Second, Armstrong argues that Dr. Mayron did not have a sufficient understanding of Attebury's exposure in order to make a causal connection. Third, Armstrong argues that, when given the opportunity to supplement the record, Dr. Mayron did so with documentation that indicates Attebury's exposure to toluene was within acceptable OSHA limits. Finally, Armstrong argues that the ALJ did not

7

set forth sufficient findings regarding the reliability of Dr. Mayron's opinion. We address each argument in turn below.

## A. Dr. Mayron produced sufficient documentation to support his opinion.

Armstrong is correct that the article from the *Annals of Neurology* which Dr. Mayron referenced in his initial report and in his deposition only addresses the effect that toluene has on toluene abusers. Furthermore, Armstrong is correct that the article refers to observable changes in brain white matter among those abusers, changes that Attebury does not have. However, other articles[1] relied on by Dr. Mayron indicate that chronic non-intentional exposure to toluene can occur in workers in the painting industry. Furthermore, the articles indicate that exposure at less than 200 ppm is associated with headache, fatigue, and nausea, while exposure at 200 to 500 ppm is associated with loss of coordination, memory loss, and loss of appetite. While Dr. Mayron may have referred only to the *Annals of Neurology* article in his written report, he testified that he relied on a number of other articles and provided those articles for review. Therefore, Armstrong's argument that Dr. Mayron's opinion was not supported by sufficient documentation is not persuasive.

---

[1] The articles are from The Agency for Toxic Substances and Disease Registry, a division of the U.S. Department of Health and Human Services; and *Medscape Reference: Drugs, Diseases & Procedures.* We note that the *Medscape* articles, which are fairly short, contain citations to numerous research articles and learned treatises.

**B.  Dr. Mayron's understanding of Attebury's exposure to toluene, while not complete, was adequate.**

Armstrong argues that Dr. Mayron's opinion was unreliable because he did not have a complete understanding of Attebury's exposure to toluene. In particular, Armstrong focuses on Dr. Mayron's inability to set forth the "dose-response relationship (that is, the relationship in which a change in amount, intensity, or duration of exposure to a chemical is associated with a change in risk of disease)."

Armstrong is correct that Dr. Mayron did not have a complete understanding of the exact amount of toluene to which Attebury was exposed. Armstrong is also correct that Dr. Mayron did not state with specificity what the dose-response relationship to toluene exposure and toxic encephalopathy is. However, "the test of reliability is flexible and the *Daubert* factors neither necessarily nor exclusively apply to all experts in every case." *Johnson,* 12 S.W.3d at 264.[2]

Here, Dr. Mayron did have a history that Attebury was repeatedly exposed to toluene while performing his job in a confined space. Furthermore, the ALJ found that Attebury "testified . . . and related to Dr. Mayron his exposure," a finding that Armstrong did not challenge via a petition for

---

[2] We note that Armstrong relies, in part, on *Adams v. Cooper Industries, Inc.,* CIVA 03-476 JBC, 2007 WL 2219212 (E.D. Ky. July 30, 2007) for the proposition that an expert's opinion must include evidence of sufficient exposure to have caused a plaintiff's condition, or a dose-response relationship. However, we note that the federal district court also stated that "'precise' or 'exact' information concerning dosage or the dose-response relationship" is not necessary. *Id.* at *7.

reconsideration. Finally, as noted above, documentation attached to Dr. Mayron's deposition indicates that chronic toluene exposure can result in headache, fatigue, nausea, and loss of coordination, memory, and appetite. Thus, the record contains sufficient evidence to support the ALJ's finding that Dr. Mayron had an adequate understanding of Attebury's exposure to toluene and the impact of that exposure.

## C. Implications of OSHA Regulations.

Armstrong argues that Dr. Mayron's opinion was unreliable because documents attached to his deposition indicate that OSHA has set a permissible exposure limit of 200 ppm averaged over an eight-hour day. According to Armstrong, Attebury's "failure to present any evidence that he was exposed to toluene at levels above the OSHA [permissible exposure limit], and his failure to produce any evidence that occupational exposure to toluene within the OSHA [permissible exposure limit] can cause toxic encephalopathy" is fatal to Attebury's claim. We disagree for three reasons.

Initially, we note that Armstrong states that a can of Krylon paint contains "20 ppm of toluene" per can and cites to its post-hearing brief as authority for that assertion. Armstrong's post-hearing brief does cite to a web page containing information about the contents of Krylon paint. However, Armstrong did not enter that information into the record; did not move to extend proof time past the hearing; and, although Armstrong cited to a federal district court case from the Southern District of California[3] indicating that a

---

[3] *Shalaby v. Bernzomatic*, 281 F.R.D. 565, 570 (S.D. Cal. 2012).

"[c]ourt can take judicial notice of MSDS[4] sheets [sic]," Armstrong did not move the ALJ to take judicial notice of the web page's contents. Thus, Armstrong's argument that, if Attebury had used four cans of Krylon paint per shift he would have been exposed to only a "maximum of 80 ppm" of toluene per shift, lacks an evidentiary basis.

Second, Armstrong argues that there is no evidence indicating that exposure to less than the permissible exposure limit can cause toxic encephalopathy. However, Dr. Mayron testified that Attebury has toxic encephalopathy and that condition is related to Attebury's exposure to toluene. Thus, while Armstrong may not believe that evidence is reliable, there is evidence of the connection.

Third, Armstrong argues that because Attebury's exposure to toluene was allegedly below OSHA permissible exposure limits, Dr. Mayron's opinion must be discredited. Certainly the ALJ could have discounted Dr. Mayron's opinion and found for Armstrong because of the absence of such evidence, but he was not compelled to do so. Furthermore, Armstrong has cited us to no case law that frees an employer from workers' compensation liability because the employer complied with OSHA regulations. Compliance with OSHA regulations may have significant relevance in a safety violation claim but such compliance is not dispositive as to causation or liability.

---

[4] Material Safety Data Sheet.

11

## D.    Sufficiency of the ALJ's finding of reliability.

Finally, Armstrong argues that the ALJ, the Board, and the majority of the Court of Appeals focused on the wrong factors in evaluating the reliability of Dr. Mayron's opinion. According to Armstrong, all three looked to Dr. Mayron's credentials rather than "the methodologies Dr. Mayron employed in reaching his opinion." We disagree.

In *City of Owensboro*, the ALJ found that Adams was totally disabled as a result of bilateral trigeminal neuralgia that Adams developed following exposure to methane. 136 S.W.3d at 448. As Armstrong does here, the City of Owensboro challenged the reliability of the opinion of causation by Adams's physician. In his opinion, the ALJ stated as follows:

> In this instance, the vitae of Dr. Van Loveren [sic] was introduced through his testimony. His qualification leaves no doubt that he is an experienced and recognized expert in the treatment of trigeminal neuralgia. Additionally, he testified that he had treated over 1000 cases in his career. He further explained that the situation presented by Mr. Adams was indeed unique. By reviewing diagnostic testing, he eliminated other potential causes, including the most common, multiple sclerosis, as a cause of Mr. Adams' condition. He further testified that Mr. Adams was exposed to a toxic substance, methane, which was also toxic to nerves. Having eliminated other potential causes of the condition and noting the onset of the preliminary stages of the condition following the 1987 injury and exposure, Dr. Van Loveren [sic] concluded that it was a probable cause of the Plaintiff's condition. *I am persuaded by his expertise and analysis, in conjunction with the scientific testing done to eliminate other potential causes,* that the exposure to methane in 1987 was the cause of the Plaintiff's trigeminal neuralgia *and that Dr. Van Loveren's [sic] opinion comports with the requirements of KRE 702.*

*Id.* at 453 (emphasis in original).

Here, the ALJ found as follows:

> Dr. Mayron states that one of the potential side effects of the Krylon paint is toxic encephalopathy. This is the diagnosis he makes for the Plaintiff. He states the toxic encephalopathy is work-related. Dr. Mayron testified in his deposition that he extensively reviewed the Krylon paint, particularly the toluene. It can cause the toxic encephalopathy and it can cause all of the Plaintiff's neurologic symptoms. The damage is permanent. In short, while I respect both physicians who provided an opinion regarding causation I am more inclined to find the opinion of Dr. Mayron persuasive. He is a treating physician with no known or demonstrated bias. His is a very specific field and area of expertise to which he devotes his practice, i.e. neurological conditions. He has demonstrated the scholarly texts he relies upon. There is no other known source of causation for the Plaintiff's symptoms, as I agree that the ADHD, anxiety or depression is not causing them.
>
> I am not persuaded by the Defendant's argument that Dr. Mayron had insufficient knowledge regarding the amount of toluene exposure. The Plaintiff testified to me and related to Dr. Mayron his exposure levels. That it was not measured in parts per milliliter or some other scientifically exact amount is not decisive.
> I find, based on the foregoing, that the Plaintiff does have toxic encephalopathy and it is work-related.

With the exception that he did not specifically state that Dr. Mayron's opinion complied with Kentucky Rule of Evidence 702, the opinion of the ALJ herein is consistent with the ALJ's opinion in *City of Owensboro*. Therefore, we discern no deficiency in this ALJ's opinion or award.

## IV. CONCLUSION.

Having reviewed the record and the arguments of the parties, we affirm the Court of Appeals.

All sitting. Minton, C.J.; Cunningham, Hughes, Keller, Venters and Wright, JJ., concur. VanMeter, J., concurs in result only.

13

COUNSEL FOR APPELLANT:

William Messer
Miller Wells PLLC

COUNSEL FOR APPELLEE:

Jerry P. Rhoads
Rhoads & Rhoads, P.S.C.