STAPLES, INC., Appellant,

v.

Dianne C. KONVELSKI; Donna H. Terry, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 2000–SC–1050–WC.

Supreme Court of Kentucky.

Aug. 23, 2001.

Rehearing Denied Oct. 25, 2001.

C. Patrick Fulton, Fulton & Devlin, Louisville, for appellant.

Kenneth F. Smart, Leitchfield, for appellee Konvelski.

## OPINION OF THE COURT

An Administrative Law Judge (ALJ) determined that the claimant was totally occupationally disabled by the combination of a work-related injury to her arm and psychological conditions that resulted from the injury. Appealing, the employer asserted that the existence of thoracic outlet compression and depression was not established by objective medical findings as required by KRS 342.0011(1) and that the treating psychiatrist lacked a sufficient basis to conclude that the claimant's psychological condition was a direct result of her physical injury. The arguments were rejected by the Workers' Compensation Board (Board) and the Court of Appeals, and this appeal by the employer followed.

The claimant was the general manager of one the employer's stores. She oversaw all store operations and employees but also helped move stock and unload trucks of merchandise. On January 16, 1997, while workers were attempting to move supplies, a box that weighed in the vicinity of 30–50 pounds fell from over her head and struck her outstretched right arm. The top of her forearm and mid-upper biceps area became painful, and eventually there was bruising. A subsequent x-ray revealed no sign of a fracture, and the physician who examined her diagnosed contusions of the right arm. She later sought treatment from her family doctor and a chiropractor for continuing problems with her arm.

Nearly a year after the accident, the claimant saw Dr. Singer, an orthopedic surgeon, giving a history of the incident and of pain from the shoulder to her hand. His treatment records indicate that he saw her several times and that she was highly emotional and frequently cried, demonstrating histrionic behavior and reacting as to pain at the slightest touch. He ordered an EMG of the arm and a full-body bone scan, both of which were normal, and referred the claimant to Dr. Atasoy. In Dr. Singer's opinion, the claimant could return to do what work she was able, without formal restrictions. In view of her exaggerated pain response, he thought that there was a psychological component to her symptoms but would defer to a psychiatrist for confirmation of that opinion.

In April, 1998, the claimant began treatment with Dr. Atasoy. His examination notes were extensive. They indicated that she exhibited equal skin temperature, no atrophy, tenderness at the mobile wad, or lateral epicondylar tenderness, and had a positive middle finger test with some right upper dorsal forearm pain. She was quite tender in the right scalene and infraclavicular area, very tender with tapping and compression with right hand coldness. She was quite tender in the right trapezial, periscapular trigger points and very tender in the right rotator cuff and anterior shoulder near the bicipital groove. She exhibited a positive stress test to right shoulder pain with painful internal rotation, normal right shoulder abduction with pain in the right trapezial area. A positive neck tilt indicated neck and shoulder pain with right arm heaviness and numbness in all fingers. Positive and negative hyperabduction revealed only right upper arm discomfort, some right hand coolness, and

no numbness and tingling. Positive costoclavicular compression revealed right upper inner arm pain, right arm heaviness and coolness of the right hand with tingling in all fingers. Her grip strength was 18 pounds on the right and 60 pounds on the left. Based upon the foregoing, he diagnosed right upper back myofascitis with right rotator cuff and bicipital tendinitis and indicated that some symptoms were suggestive for right thoracic outlet compression. Dr. Atasoy's notes indicate that a number of these tests and others were performed during subsequent visits. He assigned a 15–18% functional impairment and imposed restrictions on lifting, repetitive use of the right hand and arm, overhead work, and the use of pneumatic tools.

In June, 1998, Dr. Atasoy referred the claimant to Dr. Kornfeld, a psychiatrist, who was deposed on April 1, 1999, and who also submitted his treatment notes from June 29, 1998, to March 23, 1999. In addition to recording the events and specific behaviors that the claimant recounted and his conclusions with regard to her emotional status, they contained some of his own observations. Included, for example, are notations that she cried when relating certain information to him, that he observed that she was seriously overweight, that she was withdrawn, and that during particular visits she was preoccupied with certain matters.

Dr. Kornfeld indicated that he followed the method set forth in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, third edition, otherwise known as the DSM III, in arriving at his diagnosis. His Axis I diagnosis was major depression, post-traumatic stress disorder, and generalized anxiety disorder. He found no evidence of a preexisting personality disorder and, therefore, no basis to make an Axis II

diagnosis. With regard to Axis III, he noted the work-related injury and various prior, unrelated surgeries. He rated the Axis IV psychosocial stressors as being severe, including the loss of her job, income, function, and self-respect as examples. At a number of visits he rated the claimant's level of functioning under the 100–point scale that is used for Axis V. He explained that an Axis V rating of 70 indicated normal functioning, that the claimant's rating was 30 when he first saw her, at which point she was "in terrible shape," and that her rating later improved to as high as 40. He testified that he had not performed an MMPI, WRAT or other such standardized test on the claimant, that psychiatrists generally use such tests only when a case is "absolutely bewildering," and that it was not difficult to diagnose the claimant's problem or its source. In his opinion, the psychological conditions were caused by the work-related injury and its financial consequences, and they left the claimant with little, if any, ability to deal with the public, workplace stress, or with supervisory personnel. Her ability to concentrate was impaired, and she was irritable and preoccupied with her physical condition. Furthermore, her mental condition was unlikely to improve until her physical condition improved to the point that she could work again.

On cross-examination, Dr. Kornfeld testified that he had received a history of her physical and psychological problems from the claimant. He had also received information concerning the claimant's history and the results of the diagnostic studies from Dr. Atasoy, and his file contained both the letter of referral and a copy of Dr. Atasoy's treatment notes. He indicated that he had not personally verified whether the claimant "truly has a medical condition .. in her upper extremity," explaining that matters concerning the physi-

cal effects of the trauma were outside his area of expertise.

Dr. Weiss, a neurosurgeon, examined the claimant in December, 1997. His report of the physical examination included observations that her gait and station were normal, that there was no evidence of myelopathy (including specific observations that led to this conclusion), that the claimant's reflexes were hypoactive yet symmetric, that muscle bulk and tone revealed no evidence of distal atrophy or fasciculations, that foraminal opening and closure maneuvers and Spurling's sign were negative, that the range of motion in the neck was unimpaired, that there was no paraspinous muscle spasm, and that there was no external sign of trauma on the right arm. He concluded that there was no evidence of a neurologic disease or neurosurgical problem, and he was unable to diagnose anything other than a year-old localized soft tissue contusion.

After reviewing the evidence, the ALJ noted that the claimant's description of her pre- and post-injury condition was supported in large part by that of two coworkers. They described the claimant as being emotionally stable, hard-working, and energetic before the injury. After the injury, they observed her being reduced to tears by pain in her right arm, becoming irritable and difficult to please, dropping items such as a coffee cup from her right hand, and crying when she could not keep up with the physical demands of the job and the pressure of complying with the District Manager's standards for her store. The ALJ noted that the claimant sustained a contusion in the incident at work, determined that she had clearly sustained an injury as defined by the December 12, 1996, version of KRS 342.0011(1), determined that both Drs. Singer and Atasoy thought she had developed a psychological condition as a result of the injury to her

right arm, and concluded that the combination of the two problems resulted in a total occupational disability. Based upon Dr. Kornfeld's testimony, the ALJ concluded that the psychological condition was a direct result of the physical injury and, therefore, was compensable.

The employer asserts that the determinations that the thoracic outlet syndrome and psychological conditions were compensable injuries, as defined by KRS 342.0011(1), were not supported by objective medical findings, pointing out that only a contusion was evident immediately after the work-related incident. It also complains that Dr. Kornfeld did not perform an MMPI, Beck Depression Inventory, any neuropsychological testing, "or even a Rorschach Ink Blot test."

The December 12, 1996, version of KRS 342.0011(1) defines an "injury" in terms of a work-related event that proximately causes a harmful change in the human organism rather than in terms of the harmful change, itself. KRS 342.0011(1) also requires that the harmful change be evidenced by objective medical findings and that a psychological, psychiatric, or stress-related injury must be the direct result of a physical injury. Questions have arisen concerning whether a diagnosis may be considered to be an objective medical finding as that term is defined by KRS 342.0011(33). In *Gibbs v. Premier Scale Co.*, Ky., 50 S.W.3d 754 (2001), we determined that a diagnosis may comply with the requirements of KRS 342.0011(1) and (33) if it is based upon symptoms of a harmful change that are confirmed by means of direct observation and/or testing applying objective or standardized methods. We explained that the term "testing" does not require the use of sophisticated diagnostic tools and that both testing and observation are not required. Although KRS 342.0011(1) clearly requires

that there be objective medical findings of a harmful change in the human organism in order for that change to be compensable, we are not persuaded that KRS 342.0011(1) requires causation to be proved by objective medical findings. In the instant case, the ALJ was persuaded by the claimant's experts, both with regard to the existence of the harmful changes that she alleged and to the cause of those harmful changes. Where the ALJ finds in favor of the party with the burden of proof, the standard for review of the finding is whether it is supported in the record by any evidence of substance and, therefore, is reasonable. *Special Fund v. Francis*, Ky., 708 S.W.2d 641, 643 (1986).

█ The medical records that were in evidence in this case contained information concerning the claimant's complaints of symptoms, but they also contained information concerning the direct observations of the physicians and the results of tests they performed. Dr. Singer recorded a number of direct observations. Dr. Atasoy also recorded a number of direct observations of the claimant and performed a number of tests of her physical function before arriving at his diagnosis and determining that the accident at work was the cause of the problems with her right arm. Dr. Weiss also made a number of direct observations and performed some tests before concluding that she suffered no more than a contusion. In instances where the medical evidence is conflicting, the sole authority to determine which witness to believe resides with the ALJ. *Pruitt v. Bugg Brothers*, Ky., 547 S.W.2d 123 (1977).

█ Although the evidence concerning the severity and permanency of the harmful change to the claimant's arm was conflicting, it is apparent that substantial evidence in the record supported the finding that the claimant suffered a disabling physical injury to her right upper arm, and

the employer has pointed to no evidence that compelled a contrary finding. With regard to Dr. Kornfeld's failure to perform certain standardized tests to confirm his diagnosis, we refer the employer to the testimony that his diagnosis was consistent with the standard set forth in the DSM III and note the dearth of expert testimony that it was not. Dr. Kornfeld made direct observations of the claimant that supported his diagnosis, and both Drs. Singer and Atasoy concluded from their observations and testing that there was a psychological component to the claimant's physical problems. Finally, in view of the fact that the existence of the claimant's physical injury was outside Dr. Kornfeld's area of expertise, but was within Dr. Atasoy's area of expertise, it was appropriate for him to rely upon Dr. Atasoy's opinion with regard to that fact. This reliance in no way weakened the evidentiary value of his opinion that the claimant's psychological problems were a direct result of her physical injury and, in fact, could be viewed as strengthening it. The ALJ's finding that the claimant sustained a disabling psychological injury as a direct result of her physical injury was supported by substantial evidence in the record and, therefore, it should not be disturbed on appeal.

The decision of the Court of Appeals is affirmed.

All concur.