**BROWN–FORMAN CORPORATION,**
**Appellant**

v.

**Marion Louise UPCHURCH; Hon. Donna H. Terry, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

No. 2003–SC–0072–WC.

Supreme Court of Kentucky.

Feb. 19, 2004.

---

17. KRS 371.065(2).

C. Patrick Fulton, Fulton & Devlin, Louisville, Counsel for Appellant.

Tamara Todd Cotton, Christopher P. Evensen, Tamara Todd Cotton & Associates, Louisville, Counsel for Appellee.

## OPINION OF THE COURT

The claimant's award of a permanent total disability for work-related wrist injuries has been affirmed by the Workers' Compensation Board (Board) and the Court of Appeals. Appealing, the employer maintains that the claim was not filed within the applicable period of limitations and that the Administrative Law Judge (ALJ) erred by admitting certain expert medical testimony concerning the cause of

her condition. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Goodyear Tire and Rubber Co. v. Thompson,* Ky., 11 S.W.3d 575 (2000). We affirm.

The claimant was a 49–year–old high school graduate with no specialized or vocational training. She worked for the defendant-employer for 32 years, performing a number of production and janitorial duties. In the years preceding her retirement, she worked as a case handler. Although her job duties rotated every two hours, all of them involved the repetitive use of her hands and arms.

In May, 1997, the claimant sought treatment in the employer's medical department after falling and catching her weight on her right wrist. Dr. Bonnarens diagnosed a strain and excised a ganglion cyst in September, 1997. In October, 1998, the claimant experienced pain in her right arm and neck and again sought medical treatment. Dr. Urda, a company doctor, advised her that her symptoms were not work-related. Shortly thereafter, the claimant saw her family physician and was referred to Dr. Hockenbury, an orthopedic surgeon with whom she scheduled an appointment for March, 1999.

On February 5, 1999, the claimant developed right arm, wrist, hand, and neck pain while pulling beverage cases off a production line. She notified the company nurse and filed an injury report. She testified that she began to miss work periodically due to wrist pain, using time under the Family and Medical Leave Act. Although she did not seek immediate medical treatment, she saw Dr. Hockenbury in March, 1999, as scheduled. After receiving a history of neck and right trapezial pain that had persisted for a year, wrist pain that increased over a period of several weeks, and no history of left wrist trauma, Dr.

Hockenbury diagnosed cervical degenerative disc disease and a left wrist scapholunate ligament tear with DISI instability pattern. He referred the claimant to a hand surgeon.

On March 30, 1999, the claimant fell off a ladder, catching herself with her left hand and wrist. Again, she reported the incident to the nurse and filed an injury report. On May 5, 1999, working with her left hand and wrist in a cast, the claimant developed right hand and wrist pain while attempting to secure promotional CD's to bottles. She sought treatment from the company doctor and was diagnosed with a right wrist sprain.

The claimant testified that she last worked on November 5, 1999, and retired on December 31, 1999. On December 13, 2000, she filed a workers' compensation claim, wherein she alleged a gradual injury due to 32 years of repetitive trauma from using both of her arms in her work and also listed the three incidents from 1998–99. After retiring, the claimant underwent surgery to her left wrist. Her physician also recommended surgery to her right wrist. She testified that she continued to experience severe wrist pain that interfered with her activities of daily life and that she took no pain or anti-inflammatory medication.

The claimant began treatment with Kleinert, Kutz & Associates, on April 9, 1999, complaining of a four-month history of left wrist pain. She was diagnosed with chronic scapholunate dissociation of the left wrist. Dr. Gupta, a hand surgeon who was associated with the practice, took over the case on May 21, 1999, and began treating the claimant for bilateral wrist pain that was worse on the left side. He noted that the claimant had fallen from a ladder at work on March 30. In a July, 1999, letter to the employer's carrier, he diagnosed bilateral scapholunate separation and ra-

dioscaphoid arthritis of the left wrist, indicating that the conditions may have been aroused by the March 30, 1999, fall at work. A September 9, 1999, letter to the claimant's counsel indicated that her years of repetitive production work had caused the tendons in her wrists to "wear out," causing the scapholunate separation, and that the resulting change in the biometrics of her hand led to her current problems. On January 11, 2000, after conservative treatment of the left hand proved to be ineffective, Dr. Gupta excised the scaphoid bone and fused the capitolunate, using two Herbert's screws and a scaphoid bone graft. He indicated that the claimant retained a 30–40% loss of motion in the left wrist and a 30–40% loss of grip strength after the surgery.

When deposed on what was a vigorous cross-examination, Dr. Gupta explained that ligaments stabilize the carpal bones and control movement between the rows of bones in the hand. A laxity of those ligaments disrupts the normal alignment of the bones, altering the biomechanics of the wrist. As a result, most of the load falls onto the scaphoid bone, resulting in degenerative changes such as loss of cartilage and arthritis. Even nominal activity is painful to an individual with radioscaphoid arthritis. Dr. Gupta further explained that some individuals are genetically predisposed to ligamentous laxity, while others develop the condition due to a traumatic injury. In the absence of any specific severe injury to the wrist, his opinion was that the claimant's scapholunate ligament "wore out" due to the repetitive or cyclical loading of her wrists while performing her work for 32 years. He admitted, however, that of the approximately 1,500 cases he had treated, only 5 were caused by the repetitive demands of work, making work more a possible than probable cause of the condition. Attached to his deposition were articles and medical references to support

his view that the claimant's work caused her condition. Counsel for the employer objected to Dr. Gupta's opinion of causation, maintaining that it was not based upon a reasonable medical probability and that none of the articles indicated that individuals who performed 30 years of repetitive motion with high cyclical loading were more likely to develop radioscaphoid arthritis.

Dr. Sheridan, an orthopedic surgeon, examined the claimant on January 16, 2001. He diagnosed bilateral scapholunate instability with radiocarpal arthritis, noting the prior surgery, and also diagnosed cervical and lumbar strains. He assigned a 22% combined impairment and agreed with Dr. Gupta that the claimant's conditions were due to the nature of her work. When deposed, he stated that scapholunate instability is usually associated with trauma or ligamentous laxity but that some individuals appear to be genetically predisposed to the condition. Although he admitted that he was unaware of any study or medical literature that linked production workers to the condition or to an increased risk of developing the condition, the claimant later moved to admit into evidence an affidavit by Dr. Sheridan that claimed to include such literature. Ruling on the employer's objection to admitting the literature, the ALJ noted that articles of which Dr. Sheridan had been unaware could not have formed the basis for the opinions to which he testified and struck them from the record.

Dr. Gabriel, a hand surgeon, performed two independent medical examinations. After the first examination, on June 23, 1999, he diagnosed a small ligamentous tear between the scaphoid and lunate bones and arthritic changes. In his opinion the conditions were not work-related. He explained that ligamentous instability of the wrist is not caused by repetitive use

unless there is some pre-existing ligamentous laxity and that he was aware of no medical literature to the contrary. After performing a second examination on March 2, 2001, Dr. Gabriel diagnosed chronic scapholunate advanced collapse of both wrists and noted the previous surgery. He did not agree that repetitive or cyclical loading would cause tearing of the ligament between the scaphoid and lunate bones.

The employer filed motions in limine, objecting to the admissibility of expert opinions by Drs. Gabriel and Gupta regarding causation on the ground that they were unreliable. KRE 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra; Goodyear Tire and Rubber Co. v. Thompson, supra*. It maintained that the opinions were based upon the physicians' personal observations and that no valid medical studies demonstrated the causal relationship to which they testified. Furthermore, their view had not been tested and was not generally accepted in the medical community. The ALJ noted, however, that the claim would not be decided by a jury and determined that the test set forth in *Daubert* did not apply to a workers' compensation proceeding. Instead, the employer's concerns over the opinions of causation went to the weight and credibility of the evidence, not its admissibility. In a petition for reconsideration that was overruled, the employer pointed out that under 803 KAR 25:010E, § 12, the Kentucky Rules of Evidence apply to workers' compensation proceedings and that under KRE 702, only expert medical testimony that meets the threshold for reliability may be admitted into evidence.

When considering the merits of the claim, the ALJ noted that records from Dr. Edwards, the claimant's family doctor, confirmed her testimony that in October, 1998, she was advised that her wrist problems were not work-related. The claimant testified that it was Dr. Gupta who first told her that her problems were due to her work. Noting that his September 9, 1999, letter to the claimant's counsel referred to the May 21, 1999, examination, the ALJ determined that the claimant learned the cause of her condition at that time. Also noting the claimant's testimony that she promptly reported any symptoms and that she reported any diagnoses to her employer and its medical department as soon as they were conveyed to her, the ALJ determined that she gave timely notice. Furthermore, she filed a timely claim within two years of learning that work was the cause of her symptoms. Based upon Dr. Gupta's testimony, the restrictions that Dr. Sheridan imposed, and the vocational evidence, the ALJ determined that the claimant was unlikely to consistently find employment and awarded a permanent total disability.

The employer maintains that the disabling reality of the claimant's injuries became manifest well before May 21, 1999. It points out that she had been under treatment since 1997. In October, 1998, she attributed her condition to her work as evidenced by the fact that she reported her symptoms to her supervisor. Although Dr. Urda informed the claimant that her symptoms were not work-related, the employer maintains that *Toyota Motor Mfg., Kentucky, Inc. v. Czarnecki*, Ky. App., 41 S.W.3d 868 (2001), is distinguishable because the claimant thought that her symptoms were work-related and because her symptoms did not show periods of exacerbation followed by periods of improvement. It also maintains that because the claimant was aware of her disabling hand injury and thought that it was caused by work, *Hill v. Sextet Mining Corp.*, Ky., 65 S.W.3d 503 (2001), is distinguishable, and her claim was barred under the rationale of *Alcan Foil Products v. Huff*, Ky., 2

S.W.3d 96 (1999). We find no merit in this argument.

Contrary to the employer's assertion, *Coslow v. General Electric Co.*, Ky., 877 S.W.2d 611 (1994), concerned claims in which an ALJ determined that the harmful change was traceable to a single incident. It has no bearing on a cumulative trauma or gradual injury claim. The ALJ determined that the claimant sustained several injuries in 1998–99 but concluded from Dr. Gupta's testimony that her present difficulties were traceable to a "wearing out" of the ligament between the scaphoid and lunate bones from 32 years of repetitive and cyclical loading in her work.

■ It was undisputed in *Alcan Foil Products v. Huff*, *supra*, that the workers knew their hearing loss was due to the cumulative effect of work-related noise exposure more than two years before they filed their claims. Although the claimant experienced symptoms at work, the company physician informed her from the outset that her symptoms were not work-related. She was entitled to rely on that information. *See Toyota Motor Mfg., Kentucky, Inc. v. Czarnecki*, *supra*. Furthermore, regardless of what the claimant might have thought, she was not a physician or an expert on medical causation and could not be expected to self-diagnose the cause of her problem. *See Hill v. Sextet Mining Corp.*, *supra*. It was not until May 21, 1999, that Dr. Gupta informed the claimant that her problems were work-related, and she filed her claim within two years of that date. Therefore, the ALJ correctly determined that the gradual injury claim was timely.

As specified in 803 KAR 25:010E, § 12, the Kentucky Rules of Evidence govern workers' compensation proceedings. KRE 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The employer asserts that all of the medical experts who testified acknowledged that the condition found in the claimant's wrists nearly always results from a significant trauma. It argues that Dr. Gupta's opinion was unreliable and should not have been admitted to show causation because it was based solely upon his treatment of approximately 5 out of 1,500 or more patients. It was not supported by peer-reviewed medical articles establishing a causal relationship between scapholunate separation and repetitive motion, by medical testing, or by medical research to show that individuals who performed the same type of work as the claimant had an increased likelihood of developing the condition.

FRE 702 was adopted in 1975. Its language is identical to KRE 702. In *Daubert*, *supra*, the U.S. Supreme Court determined that FRE 702 replaced the rule of *Frye v. United States*, 293 F. 1013 (App. D.C.1923), which was that an expert opinion that is based on a scientific technique is admissible only if the technique is generally accepted within the relevant scientific community as being reliable. While acknowledging that the trial court must function as a gate keeper to assure that only reliable expert scientific testimony is admitted, *Daubert* construed the rule as adopting a more flexible approach than the "general acceptance" standard. The goal of the rule was twofold: first, to protect the jury from being unduly influenced by "junk science," the introduction of which might give it an aura of scientific respectability in the eyes of the jury and, second, to avoid imposing a repressive scientific

orthodoxy that would inhibit the search for truth. Among the factors for the trial court to consider when determining the reliability of proffered evidence under *Daubert* were: 1.) whether the theory or technique has been tested; 2.) whether it has been subjected to peer review and publication; 3.) the rate of error for the technique; and 4.) whether the technique has found acceptance within the relevant scientific community. As the Court emphasized later in *Kumho Tire Company v. Carmichael,* 526 U.S. 137, 140–41, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238, 246–47 (1999), the test of reliability is flexible and grants the trial court the same broad latitude when deciding how to determine reliability as it receives with respect to its ultimate determination.

■ The Kentucky courts have adopted the *Daubert* and *Kumho* analyses when interpreting and applying KRE 702. *Goodyear Tire and Rubber Co. v. Thompson,* supra; *Mitchell v. Commonwealth,* Ky., 908 S.W.2d 100 (1995), *overruled on other grounds.* Under KRE 702, the trial judge acts as the gate keeper, screening the evidence that the jury will hear, but the approach for doing so is more flexible than under the previous "general acceptance" rule. A ruling on the admissibility of expert testimony is subject to the same abuse of discretion standard that applies to a ruling on any other evidentiary matter. *Goodyear, supra* at 578.

■ Although the Kentucky Rules of Evidence govern workers' compensation proceedings, the ALJ correctly determined that the test set forth in *Daubert, supra,* did not apply to the admissibility of Dr. Gupta's testimony concerning the cause of the claimant's wrist problems. In a workers' compensation proceeding, unlike a jury trial, the ALJ is both gate keeper and trier of fact. Therefore, concerns about the effects of cloaking evidence in an un-

warranted aura of respectability are absent. In any event, a finding that favors the party with the burden of proof must be based upon substantial evidence and, therefore, be reasonable in order to survive on appeal. *Special Fund v. Francis,* Ky., 708 S.W.2d 641, 643 (1986).

■ Medical causation must be proved to a reasonable medical probability with expert medical testimony but KRS 342.0011(1) does not require it to be proved with objective medical findings. *Staples, Inc. v. Konvelski,* Ky., 56 S.W.3d 412, 415 (2001); *Dupree v. Kentucky Department of Mines and Minerals,* Ky., 835 S.W.2d 887 (1992). It is the quality and substance of a physician's testimony, not the use of particular "magic words," that determines whether it rises to the level of reasonable medical probability, i.e., to the level necessary to prove a particular medical fact. *Turner v. Commonwealth,* Ky., 5 S.W.3d 119, 122–23 (1999). Where there is conflicting medical testimony concerning the cause of a harmful change, it is for the ALJ to weigh the evidence and decide which opinion is the most credible and reliable. While the existence of peer-reviewed articles and research studies that support a particular view of causation are factors that an ALJ may consider, they are not required and will not necessarily compel a particular result. Likewise, the fact that a particular cause has only rarely been associated with a harmful change will not necessarily preclude a finding that it is the cause in a particular case.

The basis for the employer's objection is the assertion that Dr. Gupta's opinion of causation is unreliable. Dr. Gupta was a hand surgeon and the claimant's treating physician. His medical expertise was not challenged. He testified to the history he received, to the course of treatment, to the results of testing and observation, and to his opinion that the physical demands of

claimant's work caused the harmful changes in her wrists. When deposed, he presented research articles and studies concerning musculoskeletal injuries, including hand injuries and their causes. A vigorous cross-examination brought out certain weaknesses in the basis for his conclusions. Furthermore, Dr. Gabriel, who was also a hand surgeon, disagreed with Dr. Gupta's theory of causation and stated that no medical studies supported a causal relationship between the claimant's wrist problems and her work. Nonetheless, the countervailing evidence was not so overwhelming as to render the decision to rely upon Dr. Gupta unreasonable.

The decision of the Court of Appeals is affirmed.

All concur.