# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0313-WC

MARQUIS CARTER                                                APPELLANT

V.            ON APPEAL FROM COURT OF APPEALS
NO. 2022-CA-1380
WORKERS' COMPENSATION NO. WC-21-00849

WEBASTO ROOF SYSTEMS; THOMAS             APPELLEES
POLITES, ADMINISTRATIVE LAW
JUDGE; AND WORKERS'
COMPENSATION BOARD

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Marquis Carter appeals from an opinion of the Court of Appeals affirming a decision of the Workers' Compensation Board, which in turn, affirmed in part and vacated in part an opinion and order issued by the Administrative Law Judge ("ALJ"). Carter asserts two contentions of error. First, he argues the Court of Appeals and the Board erred by affirming the ALJ's determination of his permanent impairment rating. Second, he argues the Court of Appeals erred by affirming the Board's decision to vacate and remand for additional findings regarding the date his cumulative trauma injury manifested for statute of limitations purposes. We affirm.

## FACTS AND PROCEDURAL HISTORY

In his Form 101, filed June 8, 2021, Carter alleged he sustained a work-related cumulative trauma back injury as an assembly line worker at Webasto Roof Systems, due to repetitive lifting, twisting, and pulling. He claimed his painful back symptoms manifested on August 20, 2019, after which he sought medical attention from his primary physician, Dr. Shannon Roberts, on August 23, 2019, and was subsequently informed by his pain management physician, Dr. Brandon Gish, that the condition was possibly caused, at least in part, by work-related cumulative trauma. In response, Webasto filed a Special Answer raising several affirmative defenses, including the running of the applicable two-year statute of limitations based on Carter allegedly having been informed that earlier low back complaints treated by Dr. Roberts in 2016 were likewise possibly work-related.

Carter was deposed on September 14, 2021. He testified he had sustained no back injuries prior to being hired at Webasto in 2013.

Initially, Carter worked for about one year in the factory's receiving department where he operated a stand-up forklift and experienced back discomfort "somewhat," requiring occasional over-the-counter anti-inflammatory medication. He thereafter worked about two years in the service department where frequent lifting of 15-20 pound glass panels caused similar sporadic back discomfort. Ultimately, he was transferred to the final assembly department where his work activities intensified, requiring him to stand for prolonged periods while engaging in repetitive screwing, turning, bending, and

2

lifting of the glass panels. He testified it was there that his "back problems kind of accumulated over the years" with no specific injury, but "really started" to worsen in 2019. Though no physician ever specifically informed him his low back complaints had been caused by his work activities, Carter admitted he had been told "it's possible."

Carter testified his back pain intensified significantly by August 20, 2019, necessitating evaluation by Dr. Roberts on August 23, 2019. Over time, Dr. Roberts provided muscle relaxers and cortisone shots, prescribed physical therapy, performed diagnostic tests including an MRI, and referred Carter to Dr. Brandon Gish for pain management. He reported both Dr. Roberts and Dr. Gish were continuing to provide treatment.

Carter worked under medically imposed physical restrictions until January 19, 2021, but has not worked since that time. Based on advice provided by the human resources department at Webasto, he testified he had applied for and received short-term and long-term disability insurance benefits. He was terminated by Webasto in January of 2022, and has since applied for Social Security disability benefits.

Carter next testified at the March 16, 2022, final hearing. He admitted to having seen Dr. Roberts in 2016 for back complaints but asserted symptoms had fully resolved, requiring no further treatment relative to back problems from 2017 until his return to her office on August 23, 2019. Though he had experienced some occasional back discomfort during that period, these sporadic episodes were never as severe as the unrelenting pain he had

3

experienced since August of 2019.  He testified Dr. Gish had informed him his current back problems could have possibly arisen due to the nature of his work activities at Webasto, and he acknowledged Dr. Roberts had apprised him similarly regarding his back complaints in 2016.

At the time of the hearing, he remained under the medical care of both Dr. Roberts and Dr. Gish for severe low back and bilateral lower extremity pain, receiving ongoing prescriptions for muscle relaxers and pain medications and referrals for additional physical therapy.  He admitted he was incapable of returning to his former work activities and acknowledged his termination had been due to the exhaustion of his leave time.

The medical records of Dr. Roberts revealed Carter was examined on July 11, 2016, at Baptist Health for low back pain.  More particularly, Dr. Roberts' assistant, Sarah Grimm, PA, assessed "Pain secondary to repetitive pressure on the area related to job."  It was noted Carter had not been appropriately rotated between various workstations and a letter was sent to Webasto imposing physical restrictions relative to the specific job activities causing his discomfort.  Following an inconsequential recheck on July 20, 2016, Dr. Roberts' medical office continued to follow Carter relative to various medical needs unrelated to any further back complaints.  Interestingly, he reported no back pain at his annual physical examination on July 24, 2019.

A month later, on August 23, 2019, however, Carter returned with complaints of severe back pain.  It was noted Carter "does a lot of heavy lifting at work."  Due to the severity of his symptoms, pain injections were

4

administered on that date and on follow up examinations on September 1, 2019, and January 13, 2020.  Subsequently, a June 6, 2020, pelvic and abdominal CT scan demonstrated facet degenerative joint disease at L4-5, and November 12, 2020, lumbar x-rays showed no fracture but multilevel spondylosis changes, most advanced at L4-5.  A February 19, 2021, lumbar MRI confirmed multilevel spondylosis, most pronounced at L4-5, with moderate spinal canal and neuroforaminal narrowing.

The medical records of KORT Physical Therapy revealed Carter underwent initial evaluation for physical therapy on March 18, 2021, at which time a treatment plan recommended a four-week course of physical therapy, with two sessions performed each week.

The medical records of Dr. Brandon Gish at Commonwealth Pain and Spine revealed Carter underwent an initial evaluation on February 4, 2021, for low back pain, with the medical history indicating an onset of symptoms two years previously due to a work injury, and a recommendation for a lumbar MRI.  Two months later, on April 7, 2021, Carter's ongoing symptoms were listed as fatigue, lower extremity swelling, back pain, neck pain, joint pain, muscle pain, limited motion, numbness and shooting pain, and insomnia, for which a course of nonsteroidal anti-inflammatory drugs (NSAID) and pain medications were prescribed.  Due to persistent severe pain, lumbar medial branch nerve blocks at L3-L5 were performed, with consideration of future medial branch blocks on the left and right, along with radiofrequency ablation.

Dr. Gregory Snider performed an independent medical evaluation (IME) at Webasto's request on September 28, 2021, which included a medical history, review of medical records, and physical examination. Dr. Snider diagnosed Carter as having

> low back pain radiating to his left thigh. Imaging studies revealed degenerative change. In my opinion, this is likely multifactorial, arising from age, obesity, prior knee injury with altered gait, and potentially a work-related component. It is clear from the medical records that Mr. Carter was at least intolerant to certain activities at Webasto and was aware of a work-related etiology as far back as 2016.

Regarding causation, Dr. Snider further elaborated:

> Mr. Carter has evidence of multilevel degenerative change, somewhat in advance of what one would expect based solely on his age and habitus. These changes were symptomatically aggravated by his work at Webasto, at least according to the medical record. . . .
>
> As above, Mr. Carter's complaints are multifactorial and other contributing causes are age, habitus, altered gait from remote left knee injury, diabetes, and other avocational activities.

Dr. Snider concluded Carter reached maximum medical improvement as of January 13, 2021, and assigned a whole person impairment rating as follows:

> According to the AMA Guides, 5th Edition,[1] for Mr. Carter's lumbar complaints, estimate 6% WPI. In my opinion, half of this is apportioned to avocational factors and half to aggravation over the last four or so years of his employment at Webasto. Total: 3% WPI for assumed cumulative trauma.

In a supplemental report issued on November 22, 2021, Dr. Snider noted all parties agreed a work-related back injury occurred in 2016. Having assumed

---

[1] American Medical Association (AMA), *Guidelines to the Evaluation of Permanent Impairment* (5th ed. 2000).

6

Carter's back pain persisted since that date, Dr. Snider determined the work-related impairment would have been established in 2016.

Dr. Gregory Nazar performed an IME at Carter's request and issued a rebuttal report on December 8, 2021. He agreed with Dr. Snider's assessment of a 6% AMA impairment rating but disagreed in relation to manifestation and apportionment.

Regarding the onset of Carter's symptomatic condition, Dr. Nazar opined Carter's cumulative trauma low back injury had manifested on August 20, 2019, when the severity of his pain caused him to seek medical attention.

Regarding apportionment, Dr. Nazar attributed 80% of Carter's back condition to pre-existing conditions and only 20% to the cumulative traumatic impact of his work. Carter's pre-existing conditions included his genetic or familial predisposition for developing symptomatic degenerative spinal conditions, his morbid obesity demonstrated by carrying 280 pounds on a 5'11" frame, his advancing age of 62 years, and his history of ongoing symptomatic degenerative changes which had previously resulted in milder back discomfort. Though Dr. Nazar opined Carter had qualified for no AMA impairment rating prior to August 20, 2019, he nonetheless concluded these pre-existing conditions had already placed Carter on a progressive course for development of increasingly painful low back symptoms even absent his work environment, which merely accelerated the occurrence.

On March 16, 2022, the ALJ issued a Benefit Review Conference (BRC) Order and Memorandum, which listed the following contested issues: (1)

7

injury under the Act; (2) work-relatedness/causation; (3) statute of limitations; (4) temporary total disability benefits; (5) KRS[2] 342.730 benefits; (6) pre-existing disability and/or impairment exclusion; (7) credit/offsets; and (8) unpaid or contested medical expenses. Additionally, the ALJ noted that the timeliness of Webasto's statute-of-limitations defense had been placed into issue.

Upon consideration of the evidence, the ALJ issued an opinion, award, and order on May 16, 2022. The ALJ determined Carter had carried his burden of establishing a compensable work-related injury. The ALJ awarded Carter medical expenses and permanent partial disability benefits based upon the 3% impairment rating assessed by Dr. Snider with enhancement by the "3" multiplier[3] because Carter could not return to his pre-injury duties. The ALJ further rejected Webasto's statute of limitations defense based on Carter's testimony that his 2016 back complaints had completely resolved. As found by the ALJ, Carter's testimony in this regard was supported by the medical records of Dr. Roberts which did not reflect any treatment for back pain from late 2016 until August 23, 2019. The ALJ further relied on Dr. Nazar's opinion that Carter had a 0% impairment rating prior to August 2019.

Carter filed a petition for reconsideration arguing he was entitled to benefits based on the entire 6% impairment rating, while Webasto filed no petition. The ALJ granted Carter's petition for reconsideration in part,

---

[2] Kentucky Revised Statutes.

[3] *See* KRS 342.730(1)(c)1.

modifying the opinion and award to correct a factual misstatement regarding Dr. Nazar's assessment. However, the ALJ denied reconsideration of his decision to award benefits based on the 3% work-related AMA impairment rating as assessed by Dr. Snider. Thereafter, Carter appealed to the Board and Webasto cross-appealed.

In a decision entered on October 28, 2022, the Board affirmed in part and reversed in part. The Board affirmed the ALJ's determination of benefits based upon the 3% work-related AMA impairment rating. However, the Board vacated the award of benefits and remanded to the ALJ for additional findings pertaining to the manifestation date of Carter's cumulative trauma injury for statute of limitations purposes. The Board concluded the ALJ failed to undertake the proper analysis of KRS 342.185(3), which provides a cumulative trauma claim shall be filed "within two (2) years from the date the employee is told by a physician that the cumulative trauma is work-related." On remand, the Board directed the ALJ to

> make additional findings and determine the date of manifestation pursuant to the correct legal standard set forth in the statute and pertinent cases. . . . After doing so, the ALJ shall resolve the statute of limitations issue and make determination as to whether Carter filed his Form 101 within two years of the date of manifestation. Should the ALJ determine the claim was not filed within the two-year statute of limitations, he shall enter an amended order dismissing Carter's claim for failure to comply with the statute of limitations, KRS 342.185(3). Should the ALJ determine Carter's claim was filed within the two-year statute of limitations pursuant to KRS 342.185(3), he may reinstate his order and award based upon the impairment rating assessed by Dr. Snider.

9

Carter petitioned the Court of Appeals for review of the Board's decision. The Court of Appeals affirmed the Board in a unanimous opinion. *Carter v. Webasto Roof Sys.*, No. 2022-CA-001340-WC, (Ky. App. June 9, 2023). He now appeals to this Court as a matter of right.[4]

## STANDARD OF REVIEW

Review from an ALJ's decision on a workers' compensation claim proceeds on three levels. *Lexington Fayette Urb. Cnty Gov't v. Gosper*, 671 S.W.3d 184, 199 (Ky. 2023). "The Board performs the first level of review[,]" as set forth in KRS 342.285, and functions essentially to correct error, "though without the power of constitutional review." *Id.* The Court of Appeals performs the second level of review from the decisions of the Board pursuant to KRS 342.290 with the purpose of correcting the Board only where "the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *Id.* (quoting *W. Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992)). Further review by this Court is available "as a matter of right under Section 115 of the Kentucky Constitution[,]" and is meant to address "new or novel questions of statutory construction, or to reconsider precedent when such appears necessary, or to review a question of constitutional magnitude." *Id.* at 200 (quoting *W. Baptist*, 827 S.W.2d at 688).

---

[4] KY. CONST. § 115; *Vessels ex rel. Vessels v. Brown-Forman Distillers Corp.*, 793 S.W.2d 795, 798 (Ky. 1990).

Thus, we "will not simply 'third guess' the decisions of the Board and the Court of Appeals upon the same evidence." *Id.*

In determining disputed issues of fact, "the ALJ as 'the finder of fact . . . has the authority to determine the quality, character and substance of the evidence presented.'" *Id.* at 198 (quoting *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985)). Additionally, "an ALJ has sole discretion to decide whom and what to believe, and may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof." *Id.* (quoting *Bowerman v. Black Equip. Co.*, 297 S.W.3d 858, 866 (Ky. App. 2009)). On appellate review, "the standard of review is whether the [factual] finding was 'clearly erroneous,' meaning 'unreasonable under the evidence presented.'" *Id.* at 199 (quoting *Letcher Cnty. Bd. of Educ. v. Hall*, 576 S.W.3d 123, 126 (Ky. 2019)). However, we review "questions of law and the application of law to facts under the de novo standard." *Id.*

## ANALYSIS

Carter first argues the Court of Appeals and Board erred by affirming the ALJ's reliance on Dr. Snider's opinion attributing half of the 6% AMA impairment rating to nonoccupational factors.[5] He specifically contends Dr. Snider's opinion did not comply with apportionment analysis set forth by

---

[5] Carter also argues his own expert, Dr. Nazar, failed to comply with the AMA *Guides* regarding apportionment of causation. However, as the ALJ did not rely on Dr. Nazar's opinions as to the impairment rating, we need not address this issue.

11

Section 1.6 on pages 11-12 of the AMA *Guides*, and that the apportionment further failed to comply with the decision of the Court of Appeals in *Finley v. DBM Techs.*, 217 S.W.3d 261 (Ky. App. 2007). We disagree.

Initially, we note Carter's argument concerning compliance with the AMA *Guides* was not listed as a contested issue in the BRC order. However, Carter had previously listed this issue as contested in a disclosure filed on June 28, 2021. Further, the issue was argued and briefed by Carter at all levels of litigation. Apparently, the ALJ, Board, and the Court of Appeals treated the issue as properly preserved or otherwise subsumed within the work-relatedness and causation arguments. Perceiving no indication this issue was waived, we turn to the merits.

KRS 342.730(1)(e) specifically precludes "impairment for nonwork-related disabilities" from being considered in determining the extent of a claimant's partial permanent disability. *Tudor v. Indus. Mold & Mach. Co., Inc.*, 375 S.W.3d 63, 66 (Ky. 2012). In *Gosper*, we recently summarized the law pertaining to work-related causation in the workers' compensation setting as follows:

> [w]ork-related causation is a factual determination subject to the sound discretion of the ALJ, as the finder of fact. When determination of causation demands medical understanding and analysis beyond mere lay knowledge and skill, "the question is one properly within the province of medical experts" and "disregarding the medical evidence" is not justified. Medical opinions addressing causation need not be stated with absolute certainty or conclusiveness but are sufficient if expressed within "reasonable medical probability." The mere possibility of work-related causation is insufficient. While KRS 342.0011(1) requires objective medical findings of a *harmful change* in the human organism to

12

establish a compensable "injury," the statute does not limit proof of the *causation* of such an "injury" to objective medical findings.

671 S.W.3d at 202 (internal citations omitted). Further, "[i]t is the quality and substance of a physician's testimony, not the use of particular 'magic words,' that determines whether it rises to the level of reasonable medical probability, i.e., to the level necessary to prove a particular medical fact." *Brown-Forman Corp. v. Upchurch*, 127 S.W.3d 615, 621 (Ky. 2004).

Carter correctly cites the rule that a physician's opinion pertaining to an impairment rating must be based on the AMA *Guides*. *Jones v. Brasch-Barry Gen. Contractors*, 189 S.W.3d 149, 153 (Ky. App. 2006). However, for an impairment rating to be properly based on, or "*grounded* in the *Guides* is not to require a *strict adherence* to the *Guides*, but rather a *general conformity* with them." *Plumley v. Kroger, Inc.*, 557 S.W.3d 905, 912 (Ky. 2018). Moreover, we have long recognized "[t]he proper interpretation of the *Guides* and the proper assessment of an impairment rating are medical questions." *Id.* at 913 (quoting *Kentucky River Enters., Inc. v. Elkins*, 107 S.W.3d 206 (Ky. 2003)). Ultimately, "this Court's only prerogative is to evaluate the ALJ's decision to ensure that it is not contrary to the evidence." *Id.*

We may briefly dispose of Carter's argument regarding the proper use of the AMA *Guides* by noting the absence of any medical evidence of record criticizing Dr. Snider's use of the *Guides* generally or his apportionment of causation particularly. Moreover, in his rebuttal to Dr. Snider's opinion, Dr. Nazar, reported:

13

In the IME examination by Dr. Gregory Snider, he initially apportions 50% of his impairment rating to pre-existing factors and 50% to his cumulative work-related disability culminating on the date of August 20, 2019. *I feel that is likely a reasonable assessment*, although as you know in my IME report, I felt a little more strongly that the pre-existing component was greater (80%) in his circumstance.

(Emphasis added). Dr. Nazar reaffirmed his general approval of Dr. Snider's methodology stating, "It appears we both agree (at least on his initial report) that a portion of this [6% impairment rating] should be apportioned to pre-existing problems, as opposed to the work-related injury itself from the cumulative lifting he was doing." Under these circumstances, it was incumbent on Carter to produce some affirmative evidence contradicting Dr. Snider's apportionment method whether by cross-examination or contrary medical opinion. We will not substitute our independent interpretation of the AMA *Guides* for that of the medical experts.

Further, we adhere to "[t]he general rule . . . that compensation must be allowed for all of the injurious consequences flowing from the original injury, and not attributable to an independent, intervening cause." *Ford Motor Co. v. Jobe*, 544 S.W.3d 628, 633 (Ky. 2018) (quoting *Beech Creek Coal Co. v. Cox*, 314 Ky. 743, 744, 237 S.W.2d 56 (1951)). Pertaining to apportionment of causation, Kentucky workers' compensation law recognizes a distinction between a pre-existing dormant condition that is aroused into disabling reality by the work-related injury and a pre-existing active condition that independently produces all or part of the final disability. *Finley*, 217 S.W.3d at

14

265; *see also* 8 *Larson's Workers' Compensation Law* § 90.04[1]-[2] (2023). A pre-existing dormant condition occurs

> where the underlying pre-existing disease or condition is shown to have been asymptomatic immediately prior to the work-related traumatic event and all of the employee's permanent impairment is medically determined to have arisen after that event—due either to the effects of the trauma directly or secondary to medical treatment necessary to address previously nonexistent symptoms attributable to an underlying condition exacerbated by the event[.]

*Finley*, 217 S.W.3d at 265. Conversely, a pre-existing active condition "must be symptomatic *and* impairment ratable pursuant to the AMA *Guidelines* immediately prior to the occurrence of the work-related injury." *Id.* An employer bears the burden to prove the existence of a pre-existing condition. *Id.*

However, this Court has also recognized, in certain "atypical" situations, "the employee's pre-existing medical condition cannot be classified as either active or dormant." *Wetherby v. Amazon.com*, 580 S.W.3d 521, 530 (Ky. 2019). Indeed, every deduction from an impairment rating is not necessarily a "carve-out" under *Finley*, but instead, may result from the mandatory application of the AMA *Guides*. *Id.* at 528. Indeed, page 381 of the AMA *Guides* specifically discusses the apportionment of causation to a spinal injury as follows:

> If requested, apportion findings to the current or prior condition, following jurisdiction practices and assuming adequate information is available on the prior condition. In some instances, to apportion ratings, the percent impairment due to previous findings can simply be subtracted from the percent based on the current findings. Ideally, use the same method to compare the individual's prior and present conditions. . . . *Because there are two methods and complete data may not exist on an earlier assessment, the apportionment calculation may be less than an ideal estimate.*

(Emphasis added).

Here, Dr. Snider opined Carter's "age, habitus, altered gait from remote left knee injury, diabetes, and other avocational activities" were independent contributing causes to the back pain he experienced. This assessment was based on Dr. Snider's physical examination and review of Carter's pertinent medical history and records. He attributed these nonoccupational factors to account for 50% of the total current 6% impairment rating. Importantly, Dr. Snider neither made any conclusion these pre-existing conditions were dormant and otherwise aroused by the cumulative work-related trauma, nor did he specifically opine these pre-existing conditions were actively symptomatic at the time Carter asserted the manifestation of cumulative trauma.

Thus, as in *Wetherby*, the present appeal is distinguishable from *Finley*, 217 S.W.3d at 266, where the undisputed medical evidence compelled a finding the claimant's work-related injury exacerbated a pre-existing dormant condition, and the only question was whether the pre-existing condition was aroused permanently or merely temporarily. In the absence of contrary medical evidence, we view any purported deficiencies concerning the lack of explanatory detail in Dr. Snider's report to merely affect the weight and credibility of the evidence, the evaluation of which is committed to the sound discretion of the ALJ. We decline Carter's invitation to expand the holding of *Finley*, and further conclude the Board and the Court of Appeals were correct

16

in determining that Dr. Snider's report constituted substantial evidence upon which the ALJ was entitled to rely.

Carter next argues the Court of Appeals erred by affirming the Board's decision to vacate the award and remand to the ALJ for additional findings regarding the manifestation date for his cumulative trauma. We disagree.

In 2018, the General Assembly enacted KRS 342.185(3) to set forth the applicable limitations period in cumulative trauma claims as follows:

> The right to compensation under this chapter resulting from work-related exposure to cumulative trauma injury shall be barred unless notice of the cumulative trauma injury is given within two (2) years from the date the employee is told by a physician that the cumulative trauma injury is work-related. *An application for adjustment of claim for compensation with respect to the injury shall have been made with the department within two (2) years after the employee is told by a physician that the cumulative trauma injury is work-related.* However, the right to compensation for any cumulative trauma injury shall be forever barred, unless an application for adjustment of claim is filed with the commissioner within five (5) years after the last injurious exposure to the cumulative trauma.

(Emphasis added). This provision was intended to

> provide[] a bright-line two-year limitation period from the date the plaintiff is told her cumulative trauma is work-related. Additionally, it establishes a firm five-year repose period from the date of last exposure.

*Anderson v. Mountain Comprehensive Health Corp.*, 628 S.W.3d 10, 15 (Ky. 2021). "[T]he manifestation date . . . [is] the date a claimant is informed by a physician that her cumulative trauma injury is work-related[.]" *Ford Motor Co. v. Duckworth*, 615 S.W.3d 26, 32 (Ky. 2021). We have held "the manifestation date is a necessary determination in cumulative trauma injury claims." *Id.* at

17

Such a proper determination is required to establish "whether the claimant filed his claim within two years of that date." *Id.*

Here, by awarding benefits, the ALJ obviously rejected Webasto's argument that Carter's claim was time barred due to his present debilitating chronic low back symptoms and limitations being linked to the transient acute complaints reported in 2016. However, the ALJ made no explicit factual determination of when Carter was informed by a physician that his current disabling condition and complaints were caused by work-related cumulative trauma, thereby establishing a manifestation date congruent with the requirements of KRS 342.185(3).

Thus, we agree with the Court of Appeals and the Board that the ALJ's findings did not comport with KRS 342.185(3). And, because the Board retains authority under KRS 342.285 (2)(c) to determine whether an award conforms with KRS Chapter 342 "regardless of whether the particular error in applying the law . . . was contested by a party," we hold Webasto's failure to file a petition for reconsideration on this issue did not preclude the Board from remanding to the ALJ for a factual determination of the manifestation date and application of the appropriate legal standard to establish the claim's timeliness. *See Whittaker v. Reeder*, 30 S.W.3d 138, (Ky. 2000).

We reject Carter's assertion that remand for additional findings would be an exercise in futility. Specifically, his argument that no evidence suggests any physician ever informed him that his injuries were work-related is belied by our review of the record. At the final hearing, Carter himself testified:

18

> My doctor told me that—that this came—could come from just repetitive working, and over the years . . . things take wear and tear on you, you know. I went to a—a Dr. Gish, and Dr. Gish had said that.

Moreover, while other evidence of record may be equivocal, it, separate from Carter's own testimony, is sufficient to support a contested factual issue relative to Webasto's limitations defense. Putting aside Webasto's continued insistence that any cumulative trauma low back injury manifested in 2016, page 18 of Dr. Gish's April 16, 2021, medical record notes the onset of work-related low back pain dating back "2 years: 2018[.]" Additionally, the medical records from Carter's initial evaluation with KORT therapy indicate June 8, 2019, as the onset date of injury. Alternatively, the records of Dr. Roberts appear consistent with Carter's claimed manifestation date of August 20, 2019, and Dr. Nazar likewise adopted that date as the onset of Carter's current symptomatic condition.

Confronted by such conflicting evidence, it would be inappropriate for this Court to invade the province of the trier of fact by inferring a manifestation date from the ALJ's award or otherwise making an independent finding. Thus, we express no opinion regarding the appropriate manifestation date. On remand, the ALJ, as trier, must exercise its discretion to make a finding in accordance with KRS 342.185(3) based on its view of the evidence as a whole, and thereafter apply the appropriate legal standard to weigh Webasto's limitations defense.

Accordingly, the decision of the Court of Appeals is hereby affirmed.

19

All sitting. VanMeter, C.J.; Bisig, Conley, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only by separate opinion in which Lambert, J., joins.

THOMPSON, J., CONCURRING IN RESULT ONLY: I agree with the majority's resolution of the permanent impairment rating issue and agree that our precedent requires that we vacate and remand for additional findings by the Administrative Law Judge (ALJ) regarding the date Carter's cumulative trauma injury manifested to make it explicit that his workers compensation action was not barred by the statute of limitations. However, I disagree with the majority's discussion of this later issue. The majority seems to imply that a claimant being told by a doctor that a previous injury may be or is "work related" can be interpreted in hindsight as the claimant being told that his injury is in fact an ongoing progressive condition which constitutes a "work-related cumulative trauma injury." I also write separately to clarify the nature of cumulative trauma injuries and how such diagnosis comes about.

"[C]umulative trauma injuries . . . have similarities to both single-traumatic-event injuries and occupational diseases. Like single-traumatic-event injuries, cumulative trauma injuries are the result of trauma and, like occupational diseases, they develop over time." *Consol of Kentucky, Inc. v. Goodgame*, 479 S.W.3d 78, 82 (Ky. 2015). Cumulative trauma is essentially "gradual wear and tear" or "many mini-traumas[.]" *Id.*; *Randall v. Pendland,* 770 S.W.2d 687, 688 (Ky. App. 1988).

20

The obligation to give notice and the period of limitations for a cumulative trauma/gradual injury case is "triggered by a worker's knowledge of the harmful change and its cause rather than by the specific incidents of trauma that caused it." *American Printing House for the Blind ex rel. Mutual Ins. Corp. of America v. Brown,* 142 S.W.3d 145, 148 (Ky. 2004). With a cumulative trauma injury, the knowledge of the harmful change does not automatically correspond with disability onset. *Pine Branch Mining, LLC v. Hensley,* 590 S.W.3d 268, 274 (Ky. App. 2019). It instead "becomes manifest (for purposes of notice/limitations)" when the claimant is diagnosed with a work-related cumulative trauma injury *and* advised of that fact. *Id; Consol of Kentucky, Inc.,* 479 S.W.3d at 84.

While Carter had the burden of proving that he was entitled to workers' compensation benefits, the burden was on Webasco Roof Systems to prove that his claim was barred by the statute of limitations. *Letcher Cnty. Board of Educ. v. Hall,* 576 S.W.3d 123, 126 (Ky. 2019); *Lizdo v. Gentec Equip.* 74 S.W.3d 703, 705 (Ky. 2002).

Webesco argued that Carter suffered a cumulative trauma injury in 2016 and that his filing of his claim in 2021 was violative of the statute of limitations. The ALJ's findings of fact and conclusions of law flatly rejected this argument because "the evidence does not support such a conclusion." Instead, the ALJ found that Carter's testimony that he recovered from his back problems in 2016 was credible and in accordance with his medical records which did not reflect any treatment for any kind of low back problems from late

21

2016 until August 23, 2019. The ALJ rejected Dr. Snider's supplemental report that Carter's vocational impairment would have been established in 2016 as not persuasive as it was premised on assumptions which were not supported by the medical record. The ALJ resolved "[t]he above evidence supports a conclusion that [Carter] did not suffer a permanent cumulative trauma injury in 2016, but did suffer a permanent cumulative trauma injury on August 20, 2019. As such, [Carter's] claim is not barred by the statute of limitations."

I interpret such findings as rejecting any claim that Carter was told by a doctor any time prior to August 23, 2019 (when he was first seen for the acute pain suffered on August 20, 2019), that he had a work-related cumulative trauma injury. As explained in *Consol of Kentucky, Inc.*, 479 S.W.3d at 84, the ALJ should have made an explicit finding as to when Carter was first informed by a doctor that he had a work-related cumulative trauma injury and vacating and remanding for such a finding is appropriate. But I vehemently disagree with the majority's implication that the ALJ could appropriately find, based on the information submitted to it, that Carter received such a diagnosis prior to August 23, 2019.[6]

The majority's focus on whether Carter knew he had a work-related injury, a repetitive work-related injury, or the onset of such injury, rather than

---

[6] The majority opinion states that in Carter's Form 101 he claims he was informed by Dr. Brandon Gish, his pain management physician, sometime after seeking treatment from Dr. Shannon Roberts, on August 23, 2019, that his "condition was possibly caused, at least in part, by work-related cumulative trauma." Thus, it was up to Webasto to disprove this initial manifestation date.

when Carter was diagnosed and told by his doctor that he had a work-related cumulative trauma injury—the standard of manifestation necessary to start the statute of limitation clock—is puzzling. The manifestation date is not the date of symptoms of a work-related injury, but the date when a claimant is informed of the specific diagnosis that such injury is a work-related cumulative trauma injury. The majority opinion states:

> We reject Carter's assertion that remand for additional findings would be an exercise in futility. Specifically, his argument that no evidence suggests any physician ever informed him that his *injuries were work-related* is belied by our review of the record. At the final hearing, Carter himself testified:
>
>> My doctor told me that—that this came—could come from just *repetitive working*, and over the years . . . things take wear and tear on you, you know. I went to a—a Dr. Gish, and Dr. Gish had said that.
>
> Moreover, while other evidence of record may be equivocal, it, separate from Carter's own testimony, is sufficient to support a contested factual issue relative to Webasto's limitations defense. Putting aside Webasto's continued insistence that any cumulative trauma low back injury manifested in 2016, page 18 of Dr. Gish's April 16, 2021, medical record notes the onset of *work-related low back pain* dating back "2 years: 2018[.]" Additionally, the medical records from Carter's initial evaluation with KORT therapy indicate June 8, 2019, as the *onset date of injury*. Alternatively, the records of Dr. Roberts appear consistent with Carter's claimed manifestation date of August 20, 2019, and Dr. Nazar likewise adopted that date as the onset of Carter's current symptomatic condition.

(Emphasis added). All the alternative quoted "proof" that the majority relies upon for its conclusion that there was an active and unresolved dispute as to when Carter was first informed that he had a work-related cumulative trauma injury, only supports the fact that Carter suffered a previous work-related

23

injury based on the nature of his work, had work-related low back pain in 2016 and perhaps had further work-related low back pain in 2018 or 2019, prior to the time his condition manifested as a disabling reality that was diagnosed as a cumulative trauma injury.[7] Such pronouncements by doctors that Carter's pain was work-related and even Carter's understanding that Dr. Gish told him his pain "came" or "*could* come from . . . repetitive working . . . wear and tear" (emphasis added) and Carter's possible report to physical therapy that the acute pain he suffered on August 20, 2019, may have begun a couple of months earlier, is *not* the same as saying that any doctor ever informed Carter prior to August 23, 2019, that he *was* diagnosed with a work-related cumulative trauma injury.

As explained in *Hill v. Sextet Min. Corp.,* 65 S.W.3d 503, 507 (Ky. 2001), a claimant can be aware of having certain symptoms and experiencing flare-ups of those symptoms and even be aware that those symptoms are associated with that claimant's work, yet not have been informed by a doctor that this work "was gradually causing harmful changes . . . that were permanent." A claimant is not required to self-diagnose a gradual work-related injury in which the demands of work have accelerated a degenerative condition into a disabling reality. *Id.*

---

[7] Webasco only asserted that Carter's condition was manifested in 2016. There is no reason to consider, then, whether later dates might qualify as the initial manifestation date.

Because cumulative trauma injuries are gradual injuries, while the origin of such injuries when they finally strike as a disabling reality may be very clear when looking backwards, they are rarely clear before they become a serious condition that requires ongoing and protracted medical treatment. Doctors have no obligation to engage in speculation that work-related pain may actually and eventually become permanently disabling at some point in the future. While Carter did suffer a work-related injury in 2016, every indication is that no one informed him at that time that he was suffering from work-related cumulative trauma. This makes sense because indications were his injury was temporary and either resolved or appeared to resolve, as he was able to return to work, and apparently did not suffer any significant back pain after recovering from that injury.

Minor back pain is a fact of life for many adults who have entered into their middle or senior years and not worthy of any particular note unless and until it becomes debilitating. Likewise, it is hardly surprising that a doctor might attribute back pain to several possible causes without opining that a worker has a work-related cumulative trauma, especially if at that time it did not constitute an active impairment because it was not sufficiently advanced to constitute any degree of permanent partial disability.

As Carter appeared to fully recover from his 2016 injury, there was no need for any medical professional to look more closely at this injury and make sweeping pronouncements about what future effects he might have from the stresses of his physically demanding job. Simply put, the future was

unknowable, and doctors deal much more with diagnosing the "here and now" based on past trauma and past and current symptoms, rather than making diagnoses based on what may happen in the future. Carter's doctors may have suspected that at some point he might have permanent work-related low back problems but not know with any certainty when or if "the straw would break the camel's back." Webasto failed to prove that if Carter's doctors had such suspicions, they were ever communicated to Carter as a diagnosis at any point which would serve to divest Webasto of being liable for workers compensation benefits for Carter's work-related injury. Accordingly, I concur in result only.

Lambert, J., joins.

COUNSEL FOR APPELLANT:

James D. Howes
Law Office of James D. Howes

COUNSEL FOR APPELLEE:

Donald J. Niehaus
Walton Niehaus Law, PLLC

ADMINISTRATIVE LAW JUDGE:

Hon. Thomas Polites

WORKERS' COMPENSATION BOARD:

Hon. Michael Wayne Alvey

26